UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Michal Roseberry,

     Plaintiff,

v.

Condor Hospitality Limited
Partnership,

     Defendant.

CIVIL ACTION FILE

NO.

**JURY TRIAL DEMANDED**

## COMPLAINT

### 1.

Michal Roseberry is a victim of sex trafficking at the Savannah Suites located at 140 Pine Street NE, Atlanta, Georgia 30308. In early 2016, Michal Roseberry was violently sold for sex at the hotel.

### 2.

Defendant Condor Hospitality Limited Partnership is a foreign limited liability partnership organized under the laws of Virginia and authorized to transact business in Georgia. Service can be made on said Defendant by serving its Registered Agent: Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

### 3.

Defendant has been properly served with process in this action.

4.

Jurisdiction and venue are proper as to Condor Hospitality Limited Partnership.

5.

At all times herein, Defendant owned, operated, maintained, controlled, managed, or was responsible for securing Savannah Suites, a hotel from which it benefitted financially.

6.

Defendant knew that sex trafficking and prostitution were rampant at the hotel for years—before, during, and after Michal's trafficking. Defendant knew because:

(a)    Defendant knew about Michal while she was sold for sex at the Savannah Suites;

(b)    Defendant's employees knew of and permitted sex trafficking and prostitution to occur at the Savannah Suites;

(c)    Defendant knew about several other sex trafficking victims at the Savannah Suites before, during, and after Michal;

(d)    Defendant knew about frequent and similar crimes occurring at the Savannah Suites;

(e)    Defendant knew about the reports of Savannah Suites guests regarding sex trafficking and prostitution-related activities; and

(f)    Defendant had knowledge of sex trafficking generally in the Atlanta area and at the Savannah Suites specifically.

7.

Sex trafficking and prostitution were common occurrences at the Savannah Suites and Defendant chose to ignore, allow, condone, facilitate, support, or permit such activity at the hotel. Defendant is liable to Michal for its actions and failure to act. Defendant's liability to Michal is straightforward:

(a)    The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person **_knew or should have known_** has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). Defendant knowingly benefited from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA. While operating the hotel, a common undertaking involving risk and potential profit, Defendant (i) rented a room to Michal's traffickers so Michal could be violently sold for sex at the hotel, and (ii) did so despite what it knew or should have known about Michal being a victim of sex trafficking at the hotel. As a result of Defendant's conduct, Michal suffered physical and mental harms, and

Defendant is liable to Michal for the damages arising from those harms under the TVPRA.

(b) The Savannah Suites constituted a public nuisance under Georgia law because the hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, drugs, violence, and other dangerous illegal activity. As a direct result of this nuisance, Michal was sold for sex at the Savannah Suites, causing her substantial harm.

8.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant at the Savannah Suites.

**I.    Michal Roseberry's trafficking at the Savannah Suites.**

9.

For approximately six weeks in or around February and March 2016, Michal was illegally harbored, falsely imprisoned, and sold for sex at the Savannah Suites.

Michal's traffickers took her to the hotel because they knew it would be a good place to sell Michal for sex.

10.

Michal was sold for sex on the backside of the Savannah Suites property, where sex trafficking victims were intentionally placed by Defendant to keep them out of public view. By intentionally placing Michal in the rear of the hotel, Defendant concealed Michal's traffickers' operation and minimized their risk of detection.

11.

Michal was trafficked at the Savannah Suites by violent traffickers. She was made to have sex with roughly 10–15 men each day. Defendant knew or should have known that the huge number of men visiting the room each day was indicative of Michal's sex trafficking at the hotel.

12.

Michal was trafficked with other girls at the Savannah Suites. At times, she shared a room with 3 to 4 other victims, all of whom were also being trafficked for sex. On other occasions, the traffickers rented multiple rooms at the hotel to accommodate the number of victims they were exploiting.

13.

Michal and the other victims each saw roughly the same number of "dates" per day. Taken together, this resulted in approximately 40 to 75 total sex buyers

visiting their rooms daily. In addition to the dozens of men coming to the rooms to buy sex, Michal's traffickers also sold drugs at the hotel, which led to even more foot traffic to the rooms.

14.

Michal and the other victims showed visible signs of abuse, including bruises, split lips, and chunks of hair torn from their scalps. And they often appeared around the hotel in skimpy clothes to attract buyers of sex.

15.

Michal and the other girls were noticeably under the control of their traffickers at the hotel. The traffickers frequently made a scene to emphasize their control over the girls. The girls were also not allowed access to phones, money, or identification and had to walk around the hotel with their heads down to avoid eye contact with others.

16.

On multiple occasions, Michal stood on the balcony outside her room wearing very little clothing in cold weather while her trafficker yelled at her, called her names, and threatened to throw her off the balcony. These incidents occurred in a common area of the hotel, were visible to anyone nearby, and no one intervened or called the police.

17.

Employees of the Savannah Suites were familiar with and accommodated Michal's traffickers and their sex trafficking operation. Hotel staff, including a male maintenance employee who was regularly present during Michal's trafficking, referred to her traffickers by their street names, "Joker", "Bo", and "Silly," and exchanged fist bumps and high fives when they saw each other around the property, which signaled a level of familiarity and rapport that went beyond mere recognition.

18.

Buyers of sex arriving at the Savannah Suites would ask employees where "Phoenix" was, and employees would direct them to her room. "Phoenix" was the name Michal used when selling sex. By knowingly directing buyers of sex to Michal's room, employees streamlined access to her, furthering her traffickers' operation.

19.

The maintenance employee sold drugs to Michal's traffickers and was a constant presence in their room. Sometimes, if the maintenance employee was in the traffickers' room when Michal's "date" arrived, he would have to leave. Other times, Michal would take the "date" to the room next door for a short time and then return and hand money to her traffickers in front of the employee.

20.

Once, while the maintenance employee was hanging out in the room, one of Michal's traffickers became angry with her and pinned her against the wall, yelling at Michal to shut up and threatening her. This occurred in full view of the maintenance employee, who did not call the police or otherwise offer aid to Michal.

21.

During a "date," if the buyer of sex asked for drugs, Michal and her traffickers would find the maintenance employee, who would come into the room where Michal was being purchased for sex and sell drugs to the buyer.

22.

While the maintenance employee was in the room, trash cans were filled with used condoms, boxes of condoms and bottles of lubricant were visible on the dresser, multiple girls were present wearing underwear or revealing clothing, and drug needles and other paraphernalia were in plain view. Defendant knew or should have known that these signs, among others, were signs of Michal's trafficking at the hotel.

23.

Defendant knew or should have known that Michal was being trafficked based on these signs and behaviors.

24.

Defendant had a policy not to call the police regarding known or suspected sex trafficking at the hotel. Defendant followed this policy in the case of Michal as well as other sex-trafficking victims.

25.

Illicit activity at the hotel was pervasive. On average, there were usually at least 10 other girls at the Savannah Suites or in the parking lot being sold for sex, and each was controlled by a pimp.

26.

The widespread commercial sex activity at the Savannah Suites attracted a significant number of buyers to the property each day. Michal estimates that the Savannah Suites accommodated more than 100 buyers each day. Defendant knew or should have known that the number of daily male visitors to the hotel was clearly indicative of sex trafficking.

27.

Defendant maintained a policy or practice of allowing and facilitating trafficking at the Savannah Suites, including the trafficking of Michal. This policy was implemented in part, by agreeing to house Michal's traffickers' trafficking ventures, associates, and victims, knowingly placing Michal on the backside of the hotel, concealing her sex trafficking and protecting her traffickers from detection, streamlining

9

access to Michal by directing buyers of sex where to go, and supplying buyers of sex with the items they requested, including drugs.

## II.     Defendant's knowledge of crime at the Savannah Suites.

28.

The Savannah Suites had a well-established reputation for criminal activity, including prostitution and sex trafficking.

29.

Defendant owned and operated the Savannah Suites and employed the employees there, giving it specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during that period.

30.

The back of the hotel had constant activity, with buyers of commercial sex coming and going from multiple hotel rooms after staying for short periods.

31.

Before, during, and after Michal's sex trafficking at the Savannah Suites prostitution and sex trafficking were rampant and frequent occurrences at the hotel and were obvious to employees and guests.

32.

Defendant provided a market and beds for sex traffickers to sell victims to buyers of commercial sex. That is why Michal's traffickers brought her to the Savannah Suites to be sold for sex.

10

33.

Defendant had actual or constructive knowledge of Savannah Suites's publicly available online reviews that reported prostitution and crime at the hotel, including the following (reproduced verbatim):

1. <u>July 16, 2005, from TripAdvisor:</u>

   This is the worst possible hotel/BB ever. **It is situated in an area full of drug dealers and prostitutes**. . . .

2. <u>October 31, 2011, from TripAdvisor:</u>

   Trashy, Drug Infested, **Open Prostitution**

   The title sums it up. I would not suggest that my worst frienemy stay here. The location is next to a large homeless shelter, drugs are bought and sold on the open market within view from your room. **Hookers openly work near by (not high class call girls, but street walkers)**. This is the nastiest place I have ever seen, though it's proximity to downtown is not that bad.

   This is absolutely the worst place I have ever been at, it has the feeling of a crackhouse. One has to wonder just how many people have been shot at this place.

   Don't waste you money, if this place was free is's not worth staying at. You feel like you have to stay up all night watching your car to avoid it being broken into.

   Disgusting

3. <u>November 18, 2011, from TripAdvisor:</u>

   . . . The Area is very very High in crime with an excessive amount of shady characters frequently the area. **The area is high in**

11

**Prostitution, Drug Activity and vagrancy!!!** I felt very unsafe and the security does a very poor job at keeping out undesirables!! . . .

4.  November 18, 2011, from TripAdvisor:

This hotel isn't the worst hotel I've stayed at but it certainly isn't the greatest either. For a few extra bucks I'd suggest staying else-where. This place was in a dangerous part of town you had to be checked in with a security gaurd with each time you return to the hotel.**Drugs and prostitution all around**. Homeless shelter right across the street. Roaches were reported but I didn't see any of course i left my lights on all night.

5.  August 8, 2012, from TripAdvisor:

Please stay away...for your own safety

I booked this place for 3 nights because of its proximity to the hos-pital and I didn't have a car. I have traveled extensively and never had an experience as bad as this one. **The drug dealers and pros-titutes standing in front all night were bad enough**, being ac-costed by whinos and worse just stepping outside my door was not pleasant, the paper thin walls with a fight raging next to me I could have done without, but the 8 gunshots that rang out directly in front at 3 am would have had me leaving immediately if I had thought it would be possible to get from the door to my room into a cab and safely away. At 6:30 am there were still throngs of people outside screaming - as they had done ALL night long - and I knew that walking even the 3 blocks to the hospital was utterly out of the question. One of the worst travel experiences I have ever had - I would urge anyone to stay ANYWHERE but in this place.

6.  January 16, 2014, from TripAdvisor:

. . . **This seems to be a prostitute hotel that the security rents by the hour** after hourrs since no management is on site seen several prostitutes in and out of the rooms. . . .

**On January 27, 2014, the General Manager responded:**

12

Thank you for your comment. We apologize for the condition the room was in at check in. We strive in customer satisfaction in all aspects of our business. We DO NOT condone any activity that would be deemed illegal and or immoral. We will investigate this and correct any finding we come across. I apologize for your stay and hope that you stay with us again.

7. June 2014, from TripAdvisor:

. . . WARNING DO NOT STAY HERE it is nothing like the picture or they advertisement. I am looking for them to close this Dump of a motel down and give it to a shelter. Do not even think of walking anywhere from this place you will be accosted by the homeless, drunks, druggies, prostitutes, ect. SLEEP IN YOUR CAR

8. September 2, 2014, from TripAdvisor:

Didnt even check in....

I dropped my travel buddies off at the bus station and went to check in alone. I got there and it is accross the street from the shelter and **outside there was around 70 shady looking characters.. a few prostertutes, some tran prostertutes and maybe a couple of drug dealers in the mix**. This made me feel uncomfartable. I went into the office and the man in reception was helpfull I asked a few questions about the neighbourhood and with his responses decided that it wasnt a wise decision for a single unarmed mid 20's girl travelling with all my belongings to stay there. I didnt feel safe at all.

9. January 22, 2015, from TripAdvisor:

This              is              hell              on              earth!

Walking back from restaurant on a WEDNESDAY at 2 PM **one of the hundreds of degenerate homeless, addicts and prostitutes right outside the hotel put a gun to my head and robbed me** of the cash I had in my pocket($20). If you stay at the Savannah suites bring an AK 47.

10.February 2, 2016, from Yelp:

SAVANNAH SUITES SHOULD BE REMOVED ENTIRELY FROM ALL TRAVEL WEBSITES! THIS "HOTEL" IS NOT FIT FOR REGULAR TRAVELERS! YOU HAVE BEEN WARNED! DO NOT STAY AT THIS HOTEL! . . . Expedia should remove this place from their website, being that **it is not a hotel for REG-ULAR travelers, but is a flophouse for homeless people and a place of business for prostitutes**! . . . [W]hen we were on our way to check out, two women who we believe were prostitutes, got off the elevator before we got on. So not only is it not a hotel, it is a place of business for prostitutes! . . .

11. November 30, 2016, from TripAdvisor:

. . . Furthermore, my **"neighbor" was a ... working girl**. . . .

34.

Defendant knew or should have known of these and other customer reports showing the dangerous nuisance of the property and the rampant crime that occurred on the premises.

35.

Defendant and its employees knew or should have known that obvious sex trafficking, including Michal's sex trafficking, was occurring at their property, at times with the assistance of its employees.

36.

Despite the dangerous, illegal, and criminal activity surrounding the property, Defendant and the hotel negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

14

37.

Despite having actual or constructive knowledge of this illegal activity, Defendant negligently failed to take reasonable steps to stop such illegal and dangerous activities from occurring, including that involving its own employees.

38.

Additionally, Defendant negligently failed to provide proper training to their employees, including among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the hotel.

39.

Defendant also negligently failed to supervise its employees to ensure the hotel was not facilitating sex trafficking and participating in sex trafficking through the business of the hotel, as was the case with Michal's trafficking.

40.

Defendant also negligently failed to train its staff in a reasonable and uniform manner, including, among other things, how staff were supposed to interact with the police and attempt to determine the nature and cause of crime occurring at the property, so the hotel could better deter or prevent crime in the future.

41.

Defendant also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at

the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

42.

Defendant knew or should have known that they were permitting the hotel to be used as a place of prostitution and sex trafficking.

**III.   Defendant's knowledge of sex trafficking generally.**

43.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

44.

Defendant knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Savannah Suites. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings

of roughly $33,000.[1] Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendant received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Michal.

45.

Defendant knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking."[2]

46.

Defendant knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where . . . sex workers meet their clients on threat

---

[1] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable,* Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Jan. 22, 2026); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30-32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Jan. 22, 2026).
[2] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* (Jan. 29, 2015), https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Jan. 22, 2026).

of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

47.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and obtained information on involving motels and hotels were sex trafficking cases, and another 2.6 percent reported a combination of sex and labor trafficking.[3] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[4] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[5] Unfortunately,

---

[3] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://traffick-inginstute.org/wp-content/uploads/2024/06/2023-2023-Federal-Human-Trafficking-Report-WEB-Spreads-LR.pdf (last visited Jan. 22, 2026).

[4] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.archive.org/web/20210511135432/https.www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf.

[5] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polaris-project.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited Jan. 22, 2026).

18

"94 percent" also "disclosed they never received any assistance, concern, or identi-fication from motel staff."[6]

48.

Defendant knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in and around motels,[7] and that the industry had been warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[8]

49.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[9]

---

[6] *Id.* at 23.

[7] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/getfile/92983.

[8] *Id.* at 19.

[9] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Jan. 22, 2026).

50.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

51.

Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct house-keeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

    (a)    persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

    (a)    persons who lack freedom of movement or are constantly moni-tored;

    (b)    persons who have no control over or possession of money or ID;

    (c)    persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

    (d)    extended stay with few or no personal possessions in the room;

    (e)    excessive amounts of sex paraphernalia in rooms (condoms, lubri-cant, lotion, etc.);

(f)     the same person reserves multiple rooms;

(g)     a room is rented hourly, less than a day, or for an atypical extended stay;

(h)     loitering and solicitation of male patrons; and

(i)     persons asking staff or patrons for food or money.

52.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Michal's case, the Savannah Suites, for a fee, provided this market for Michal to be confined and sold.

**COUNT I**
**STATUTORY LIABILITY: SEX TRAFFICKING**
**18 U.S.C. § 1595**

53.

Plaintiff incorporates the paragraphs above as if fully restated herein.

54.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendant knowingly benefitted from participation in a venture that Defendant knew or should have known engaged in acts in violation of the TVPRA.

55.

Defendant knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Savannah Suites, including the revenue generated for the room in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the Savannah Suites, Defendant knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room-rental fees.

56.

Defendant participated in a hotel venture and knew or should have known that its operation of the Savannah Suites violated the TVPRA by harboring and falsely imprisoning Plaintiff so that she could be sold for sex at the hotel. Defendant also participated in a venture by actively cooperating with Plaintiff's traffickers, placing Plaintiff in locations intended to reduce detection, knowingly directing buyers of sex to her room, supplying buyers of sex with the items they requested, and permitting Plaintiff's sex traffickers to harbor, falsely imprison, and traffic Plaintiff at the Savannah Suites.

57.

As part of her sex trafficking, Plaintiff was falsely imprisoned at the Savannah Suites. Defendant's harboring Plaintiff during her sex trafficking constituted false imprisonment. At times, Plaintiff's false imprisonment at the hotel was independent

of any other aspect of her trafficking, such as sexual encounters, assaults, or batteries she may have endured.

58.

The venture in which Defendant participated was in or affecting interstate commerce.

59.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives participated in Plaintiff's sex trafficking at the Savannah Suites. Defendant knew or should have known of this participation.

60.

Defendant also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Savannah Suites.

61.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

62.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture.

63.

Defendant is liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

64.

Thus, as described herein, Defendant is jointly and severally liable to Plaintiff for damages arising from the indivisible injuries it caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

## COUNT II
## NUISANCE

65.

Plaintiff incorporates the paragraphs above as if fully restated herein.

66.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not

be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

67.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

68.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

69.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

## Public Nuisance

70.

The Savannah Suites's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

71.

The Savannah Suites caused or contributed to a blighting effect on the surrounding community, so that the Savannah Suites negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Savannah Suites, although the effects on each person may have varied.

72.

The illegal prostitution and sex trafficking nuisance occurring at the Savannah Suites had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

73.

The acts and omissions of Defendant in permitting prostitution and sex trafficking at the Savannah Suites caused special damages to Plaintiff, as she was the victim of sex trafficking at Defendant's nuisance hotel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendant is liable to Plaintiff for all such damages.

## Public Nuisance Per Se

74.

The Savannah Suites constituted a statutory nuisance per se under Georgia law because Defendant knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the Savannah Suites including sex trafficking.

75.

A business where illegal practices are permitted constitutes a nuisance.

76.

A business, like the Savannah Suites, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

77.

Plaintiff was directly harmed as a result of the sex crime nuisance at the Savannah Suites that permitted illegal sexual activity to occur there.

78.

Defendant is liable for nuisance (public nuisance and/or per se public nuisance) by reason of its failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious

condition and of which Defendant has express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

## DAMAGES

### 79.

Plaintiff incorporates the paragraphs above as if fully restated herein.

### 80.

As a proximate and foreseeable result of Defendant's violations of the TVPRA and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendant for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Michal seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

(a)    Personal injuries;

(b)    Past, present and future conscious pain and suffering;

(c)    Loss of enjoyment of life;

(d)    Medical expenses;

28

(e)     Mental anguish and emotional distress;

(f)     Loss of past, present, and future wages;

(g)     Incidental expenses;

(h)     All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

(i)     Consequential damages to be proven at trial.

81.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendant and its employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

82.

Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendant for the following:

(a)    Process issue as provided by law;

(b)    Plaintiff be awarded actual damages in amounts to be shown at trial from Defendant;

(c)    Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

(d)    Plaintiff be awarded a trial by jury; and

(e)    Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on January 26, 2026.

                    ANDERSEN, TATE & CARR, P.C.


                    */s/ Jennifer M. Webster*
                    PATRICK J. MCDONOUGH
                    Georgia Bar No. 489855
                    pmcdonough@atclawfirm.com
                    JONATHAN S. TONGE
                    Georgia Bar No. 303999
                    jtonge@atclawfirm.com
                    JENNIFER M. WEBSTER
                    Georgia Bar No. 760381

jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

# CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile