# EXHIBIT A

## (Proposed) First Amended Complaint

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| MICHAL ROSEBERRY,<br><br>Plaintiff,<br><br>v.<br><br>CONDOR HOSPITALITY LIMITED PARTNERSHIP, TRS LEASING, INC., and STRAND DEVELOPMENT COMPANY, LLC,<br><br>Defendants. | CIVIL ACTION FILE<br><br>NO. 1:26-cv-00467-SEG<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

1.

Michal Roseberry is a victim of sex trafficking at the Savannah Suites located at 140 Pine Street NE, Atlanta, Georgia 30308. In early 2016, Ms. Roseberry was violently sold for sex at the hotel.

2.

Defendant Condor Hospitality Limited Partnership ("Condor Hospitality") is a foreign limited liability partnership organized under the laws of Virginia and authorized to transact business in Georgia. Service can be made on Condor Hospitality by serving its Registered Agent: Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

3.

Defendant Condor Hospitality has been properly served with process in this action.

4.

Jurisdiction and venue are proper as to Defendant Condor Hospitality.

5.

Defendant TRS Leasing, Inc. ("TRS Leasing") is a foreign profit corporation organized under the laws of Virginia and authorized to transact business in Georgia. Service can be made on TRS Leasing by serving its Registered Agent: Corporation Service Company, 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092.

6.

Defendant TRS Leasing has been properly served with process in this action.

7.

Jurisdiction and venue are proper as to Defendant TRS Leasing.

8.

Defendant Strand Development Company, LLC ("Strand Development") is a limited liability company organized under the laws of South Carolina, with its principal place of business in Myrtle Beach, South Carolina. It regularly conducts business in the State of Georgia, including the operation of the Savannah Suites during the relevant time period, derives substantial revenue from services rendered

in Georgia, and has committed tortious acts or omissions both within Georgia and outside of Georgia resulting in injuries in Georgia. Strand Development may be served with process by serving its Registered Agent: John Pharr, 1109 48th Ave North Ste 211G, Myrtle Beach, South Carolina 29577.

9.

Defendant Strand Development has been properly served with process in this action.

10.

Jurisdiction and venue are proper as to Defendant Strand Development.

11.

At all times herein, Defendants jointly owned, operated, maintained, controlled, managed, or were responsible for securing Savannah Suites, a hotel from which they benefitted financially.

12.

At all times relevant hereto, Defendants owned, operated, maintained, controlled, and managed the Savannah Suites as a joint venture, sharing valuable information, data, responsibilities, and financial benefits from the hotel's operation, and each having rights of mutual control over the hotel and each other.

13.

Any distinctions between Defendants Condor Hospitality and TRS Leasing are on paper only. In reality, the two Defendants shared common ownership, common management, and common control over the leasing and operation of the Savannah Suites. Defendant TRS Leasing, Inc. is ostensibly the lessee of the Savannah Suites but has no independent business apart from holding leasehold interests within the Real Estate Investment Trust ("REIT") organizational structure of Condor Hospitality Trust, Inc. and its operating partnership, Defendant Condor Hospitality Limited Partnership.

14.

Defendants Condor Hospitality and TRS Leasing shared assets, money, employees, office locations, board members, entered into contracts with each other without consideration, had employees of one company conduct the business of other companies, and generally ignored the corporate forms that are the hallmark of separate entities.

15.

For the purposes of owning, operating, and managing the Savannah Suites, during the relevant time, Defendants Condor Hospitality and TRS Leasing functioned as a single entity and exercised control jointly over the Savannah Suites and over each other.

16.

Defendants knew that sex trafficking and prostitution were rampant at the hotel for years—before, during, and after Ms. Roseberry's trafficking. Defendants knew because:

(a) Defendants knew about Ms. Roseberry while she was sold for sex at the Savannah Suites;

(b) Defendants' employees knew of and permitted sex trafficking and prostitution to occur at the Savannah Suites;

(c) Defendants knew about several other sex trafficking victims at the Savannah Suites before, during, and after Ms. Roseberry;

(d) Defendants knew about frequent and similar crimes occurring at the Savannah Suites;

(e) Defendants knew about the reports of Savannah Suites guests regarding sex trafficking and prostitution-related activities; and

(f) Defendants had knowledge of sex trafficking generally in the Atlanta area and at the Savannah Suites specifically.

17.

Sex trafficking and prostitution were common occurrences at the Savannah Suites and Defendants chose to ignore, allow, condone, facilitate, support, or permit

such activity at the hotel. Defendants are liable to Ms. Roseberry for their actions and failure to act. Defendants' liability to Ms. Roseberry is straightforward:

(a) The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person knew or should have known has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). Defendants knowingly benefited from participation in a venture that they knew or should have known engaged in an act in violation of the TVPRA. While operating the hotel, a common undertaking involving risk and potential profit, Defendants (i) rented a room to Ms. Roseberry's traffickers so Ms. Roseberry could be violently sold for sex at the hotel, and (ii) did so despite what they knew or should have known about Ms. Roseberry being a victim of sex trafficking at the hotel. As a result of Defendants' conduct, Ms. Roseberry suffered physical and mental harms, and Defendants are liable to Ms. Roseberry for the damages arising from those harms under the TVPRA.

(b) The Savannah Suites constituted a public nuisance under Georgia law because the hotel negligently or recklessly turned a blind eye

and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, drugs, violence, and other dangerous illegal activity. As a direct result of this nuisance, Ms. Roseberry was sold for sex at the Savannah Suites, causing her substantial harm.

18.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendants, the allegation is that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendants at the Savannah Suites.[1]

## I. Ms. Roseberry's trafficking at the Savannah Suites.

19.

For approximately six weeks in or around February and March 2016, Ms. Roseberry was illegally harbored, falsely imprisoned, and sold for sex at the

[1] To avoid unnecessarily increasing the length of this complaint, any time the term "Defendants" appears or a specific Defendant is named, the complaint should be read as if the allegation is made as to each Defendant and, in the alternative, to Defendants collectively as a single enterprise operating in concert.

Savannah Suites. Ms. Roseberry's traffickers took her to the hotel because they knew it would be a good place to sell Ms. Roseberry for sex.

20.

Ms. Roseberry was sold for sex on the backside of the Savannah Suites property, where sex trafficking victims were intentionally placed by Defendants to keep them out of public view. By intentionally placing Ms. Roseberry in the rear of the hotel, Defendants concealed Ms. Roseberry's traffickers' operation and minimized their risk of detection.

21.

Ms. Roseberry was trafficked at the Savannah Suites by violent traffickers. She was made to have sex with roughly 10–15 men each day. Defendants knew or should have known that the huge number of men visiting the room each day was indicative of Ms. Roseberry's sex trafficking at the hotel.

22.

Ms. Roseberry was trafficked with other girls at the Savannah Suites. At times, she shared a room with 3 to 4 other victims, all of whom were also being trafficked for sex. On other occasions, the traffickers rented multiple rooms at the hotel to accommodate the number of victims they were exploiting.

23.

Ms. Roseberry and the other victims each saw roughly the same number of "dates" per day. Taken together, this resulted in approximately 40 to 75 total sex buyers visiting their rooms daily. In addition to the dozens of men coming to the rooms to buy sex, Ms. Roseberry's traffickers also sold drugs at the hotel, which led to even more foot traffic to the rooms.

24.

Ms. Roseberry and the other victims showed visible signs of abuse, including bruises, split lips, and chunks of hair torn from their scalps. And they often appeared around the hotel in skimpy clothes to attract buyers of sex.

25.

Ms. Roseberry and the other girls were noticeably under the control of their traffickers at the hotel. The traffickers frequently made a scene to emphasize their control over the girls. The girls were also not allowed access to phones, money, or identification and had to walk around the hotel with their heads down to avoid eye contact with others.

26.

On multiple occasions, Ms. Roseberry stood on the balcony outside her room wearing very little clothing in cold weather while her trafficker yelled at her, called her names, and threatened to throw her off the balcony. These incidents occurred in

a common area of the hotel, were visible to anyone nearby, and no one intervened or called the police.

27.

Employees of the Savannah Suites were familiar with and accommodated Ms. Roseberry's traffickers and their sex trafficking operation. Hotel staff, including a male maintenance employee who was regularly present during Ms. Roseberry's trafficking, referred to her traffickers by their street names, "Joker", "Bo", and "Silly," and exchanged fist bumps and high fives when they saw each other around the property, which signaled a level of familiarity and rapport that went beyond mere recognition.

28.

Buyers of sex arriving at the Savannah Suites would ask employees where "Phoenix" was, and employees would direct them to her room. "Phoenix" was the name Ms. Roseberry used when selling sex. By knowingly directing buyers of sex to Ms. Roseberry's room, employees streamlined access to her, furthering her traffickers' operation.

29.

The maintenance employee sold drugs to Ms. Roseberry's traffickers and was a constant presence in their room. Sometimes, if the maintenance employee was in the traffickers' room when Ms. Roseberry's "date" arrived, he would have to leave.

Other times, Ms. Roseberry would take the "date" to the room next door for a short time and then return and hand money to her traffickers in front of the employee.

30.

Once, while the maintenance employee was hanging out in the room, one of Ms. Roseberry's traffickers became angry with her and pinned her against the wall, yelling at Ms. Roseberry to shut up and threatening her. This occurred in full view of the maintenance employee, who did not call the police or otherwise offer aid to Ms. Roseberry.

31.

During a "date," if the buyer of sex asked for drugs, Ms. Roseberry and her traffickers would find the maintenance employee, who would come into the room where Ms. Roseberry was being purchased for sex and sell drugs to the buyer.

32.

While the maintenance employee was in the room, trash cans were filled with used condoms, boxes of condoms and bottles of lubricant were visible on the dresser, multiple girls were present wearing underwear or revealing clothing, and drug needles and other paraphernalia were in plain view. Defendants knew or should have known that these signs, among others, were signs of Ms. Roseberry's trafficking at the hotel.

33.

Defendants knew or should have known that Ms. Roseberry was being trafficked based on these signs and behaviors.

34.

Defendants had a policy not to call the police regarding known or suspected sex trafficking at the hotel. Defendants followed this policy in the case of Ms. Roseberry as well as other sex-trafficking victims.

35.

Illicit activity at the hotel was pervasive. On average, there were usually at least 10 other girls at the Savannah Suites or in the parking lot being sold for sex, and each was controlled by a pimp.

36.

The widespread commercial sex activity at the Savannah Suites attracted a significant number of buyers to the property each day. Ms. Roseberry estimates that the Savannah Suites accommodated more than 100 buyers each day. Defendants knew or should have known that the number of daily male visitors to the hotel was clearly indicative of sex trafficking.

37.

Defendants maintained a policy or practice of allowing and facilitating trafficking at the Savannah Suites, including the trafficking of Ms. Roseberry. This

policy was implemented in part, by agreeing to house Ms. Roseberry's traffickers' trafficking ventures, associates, and victims, knowingly placing Ms. Roseberry on the backside of the hotel, concealing her sex trafficking and protecting her traffickers from detection, streamlining access to Ms. Roseberry by directing buyers of sex where to go, and supplying buyers of sex with the items they requested, including drugs.

## II. Defendants' knowledge of crime at the Savannah Suites.

38.

The Savannah Suites had a well-established reputation for criminal activity, including prostitution and sex trafficking.

39.

Defendants owned and operated the Savannah Suites and employed the employees there, giving them specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during that period.

40.

The back of the hotel had constant activity, with buyers of commercial sex coming and going from multiple hotel rooms after staying for short periods.

41.

Before, during, and after Ms. Roseberry's sex trafficking at the Savannah Suites prostitution and sex trafficking were rampant and frequent occurrences at the hotel and were obvious to employees and guests.

42.

Robbie Harris, whose declaration is attached to this Complaint[2], lived at the Savannah Suites from approximately 2008 through 2012 and later worked there as a housekeeper in 2013, cleaning rooms on every floor of the hotel.

43.

During that time, Harris regularly observed girls being sold for sex throughout the hotel, in the parking, and inside the hotel rooms. Some of the girls appeared to be only fourteen or fifteen years old.

44.

While cleaning rooms, Harris observed trash cans filled with condoms, lubricant, and other sex paraphernalia. She also saw sex buyers repeatedly enter girls' rooms, remain for only a short time, and leave. This occurred throughout the day, every day.

---

[2] Ex. 1, Robbie Harris Declaration.

45.

Harris also observed pimps and drug dealers openly operating at the Savannah Suites. The pimps exercised obvious control over the girls being sold for sex, ordering them around and referring to them as “shorty.” Some of the pimps openly carried guns.

46.

The criminal activity generated violence and disturbances throughout the property. Harris observed pimps beating girls who were being sold for sex, heard gunshots, and regularly heard fighting, yelling, and cursing coming from rooms. People knocked on hotel-room doors throughout the night.

47.

Rather than preventing this activity, security permitted it to continue. Girls being sold for sex openly walked past security with sex buyers, and security allowed anyone onto the property. Although Harris was instructed to report incidents to her supervisor or security, security guards would not call law enforcement. Pimps also paid off security guards.

48.

The Savannah Suites further accommodated the commercial-sex activity by renting rooms by the hour and allowing a single person to rent multiple rooms.

49.

While working at the Savannah Suites, Harris personally told the hotel's owners that girls were being sold for sex at the property, that some of the girls were very young, and that she was finding crack pipes. The owners told Harris that they were "writing things down," but nothing was ever done and the activity continued.

50.

In the summer of 2016, Shirley Lawrence, whose declaration is attached to this Complaint[3], stayed at the Savannah Suites for approximately two months. Lawrence observed girls selling sex and people selling drugs at the property. The girls openly wore revealing clothing and waited outside for buyers of sex, including on the corner. Some appeared to Lawrence to be fifteen years old or younger.

51.

According to Lawrence, fights in the rooms were common.

52.

Patricia Smith, whose declaration is attached to this Complaint[4], stayed at the Savannah Suites in approximately the fall of 2016. Smith observed girls openly selling sex not only at the Savannah Suites but walking through the parking lot and along the street. Some appeared to Smith to be only thirteen or fourteen years old.

---

[3] Ex. 2, Shirley Lawrence Declaration.

[4] Ex. 3, Patricia Smith Declaration.

53.

According to Smith, men who appeared to be pimps, drug dealers, or sex buyers congregated around the property.

54.

The commercial-sex activity also generated substantial traffic into and out of the Savannah Suites. Smith observed that traffic increased on weekends, when men would drive into the parking lot, enter the hotel, remain only briefly, and then leave.

55.

Drug activity was likewise occurring openly. Smith observed individuals purchasing drugs from a male Savannah Suites employee. Yet the hotel continued to permit both the drug activity and the open commercial-sex activity to occur.

56.

The prostitution and sex trafficking activity occurred in the Savannah Suites's rooms, hallways, parking lot, exterior areas, and along the surrounding street. Girls and children being sold for sex solicited or waited for buyers outside; pimps, drug dealers, and sex buyers congregated around the property; and a continuous stream of visitors entered and exited the property to engage in commercial sex and other illegal activity.

57.

By permitting these conditions to persist for years, Defendants operated the Savannah Suites as a hub for prostitution and sex trafficking that attracted sex buyers, pimps, drug dealers, and others engaged in criminal activity to the property and surrounding area. The prostitution and sex trafficking at the Savannah Suites, and the activity it attracted, generated substantial traffic, violence, disturbances, and gunfire and resulted in prostitution, sex trafficking, and solicitation occurring in common areas, outside the hotel, and along the surrounding street.

58.

Thus, the effects of the prostitution and sex-trafficking nuisance Defendants permitted at the Savannah Suites reached the hotel's common areas, parking lot, exterior areas, and surrounding street, causing or contributing to an appreciable blighting effect on the surrounding community.

59.

The victims—girls and women—being trafficked for sex were harmed by the prostitution and sex trafficking nuisance at the Savannah Suites. They were sold for sex and beaten. Residents of the Savannah Suites were harmed by the constant presence of prostitution and sex trafficking in the place they were forced to reside. The surrounding community who encountered the crime, trauma, and acceptance of prostitution and sex trafficking at the Savannah Suites were harmed by witnessing

and encountering that type of pervasive crime. It was "an environment that would be dangerous and unhealthy for anyone[.]" *Northfield Ins. Co. v. Northbrook Indus., Inc.*, 749 F. Supp. 3d 1325, 1338 (N.D. Ga. 2024), *appeal dismissed sub nom. Northfield Ins. Co. v. N. Brook Indus., Inc.*, 176 F.4th 1268 (11th Cir. 2026). Being kept "in a dangerous setting where prostitution, drugs, and weapons were ubiquitous" causes harm to those who must live in, visit, and experience such a dangerous setting. *Id.* In short, everyone who encountered the sex trafficking nuisance at the Savannah Suites was harmed by it.

60.

Defendants provided a market and beds for sex traffickers to sell victims to buyers of commercial sex. That is why Ms. Roseberry's traffickers brought her to the Savannah Suites to be sold for sex.

61.

Defendants had actual or constructive knowledge of the Savannah Suites's publicly available online reviews that reported prostitution and crime at the hotel, including the following (reproduced verbatim):

1. <u>July 16, 2005, from TripAdvisor:</u>

   This is the worst possible hotel/BB ever. **It is situated in an area full of drug dealers and prostitutes**. . . .

2. <u>October 31, 2011, from TripAdvisor:</u>

Trashy, Drug Infested, **Open Prostitution**

The title sums it up. I would not suggest that my worst frienemy stay here. The location is next to a large homeless shelter, drugs are bought and sold on the open market within view from your room. **Hookers openly work near by (not high class call girls, but street walkers)**. This is the nastiest place I have ever seen, though it's proximity to downtown is not that bad.

This is absolutely the worst place I have ever been at, it has the feeling of a crackhouse. One has to wonder just how many people have been shot at this place.

Don't waste you money, if this place was free is's not worth staying at. You feel like you have to stay up all night watching your car to avoid it being broken into.

Disgusting

3. <u>November 18, 2011, from TripAdvisor:</u>

. . . The Area is very very High in crime with an excessive amount of shady characters frequently the area. **The area is high in Prostitution, Drug Activity and vagrancy!!!** I felt very unsafe and the security does a very poor job at keeping out undesirables!! . . .

4. <u>November 18, 2011, from TripAdvisor:</u>

This hotel isn't the worst hotel I've stayed at but it certainly isn't the greatest either. For a few extra bucks I'd suggest staying elsewhere. This place was in a dangerous part of town you had to be checked in with a security gaurd with each time you return to the hotel.**Drugs and prostitution all around**. Homeless shelter right across the street. Roaches were reported but I didn't see any of course i left my lights on all night.

5. August 8, 2012, from TripAdvisor:

Please stay away...for your own safety

I booked this place for 3 nights because of its proximity to the hospital and I didn't have a car. I have traveled extensively and never had an experience as bad as this one. **The drug dealers and prostitutes standing in front all night were bad enough**, being accosted by whinos and worse just stepping outside my door was not pleasant, the paper thin walls with a fight raging next to me I could have done without, but the 8 gunshots that rang out directly in front at 3 am would have had me leaving immediately if I had thought it would be possible to get from the door to my room into a cab and safely away. At 6:30 am there were still throngs of people outside screaming - as they had done ALL night long - and I knew that walking even the 3 blocks to the hospital was utterly out of the question. One of the worst travel experiences I have ever had - I would urge anyone to stay ANYWHERE but in this place.

6. January 16, 2014, from TripAdvisor:

. . . **This seems to be a prostitute hotel that the security rents by the hour** after hourrs since no management is on site seen several prostitutes in and out of the rooms. . . .

**On January 27, 2014, the General Manager responded:**

Thank you for your comment. We apologize for the condition the room was in at check in. We strive in customer satisfaction in all aspects of our business. We DO NOT condone any activity that would be deemed illegal and or immoral. We will investigate this and correct any finding we come across. I apologize for your stay and hope that you stay with us again.

7. June 2014, from TripAdvisor:

. . . WARNING DO NOT STAY HERE it is nothing like the picture or they advertisement. I am looking for them to close this Dump of a motel down and give it to a shelter. Do not even think of walking anywhere from this place you will be accosted by the

homeless, drunks, druggies, prostitutes, ect. SLEEP IN YOUR CAR

8. September 2, 2014, from TripAdvisor:

Didnt even check in....

I dropped my travel buddies off at the bus station and went to check in alone. I got there and it is accross the street from the shelter and **outside there was around 70 shady looking characters.. a few prostertutes, some tran prostertutes and maybe a couple of drug dealers in the mix**. This made me feel uncomfartable. I went into the office and the man in reception was helpfull I asked a few questions about the neighbourhood and with his responses decided that it wasnt a wise decision for a single unarmed mid 20's girl travelling with all my belongings to stay there. I didnt feel safe at all.

9. January 22, 2015, from TripAdvisor:

This is hell on earth!

Walking back from restaurant on a WEDNESDAY at 2 PM **one of the hundreds of degenerate homeless, addicts and prostitutes right outside the hotel put a gun to my head and robbed me** of the cash I had in my pocket($20). If you stay at the Savannah suites bring an AK 47.

10. February 2, 2016, from Yelp:

SAVANNAH SUITES SHOULD BE REMOVED ENTIRELY FROM ALL TRAVEL WEBSITES! THIS "HOTEL" IS NOT FIT FOR REGULAR TRAVELERS! YOU HAVE BEEN WARNED! DO NOT STAY AT THIS HOTEL! . . . Expedia should remove this place from their website, being that **it is not a hotel for REGULAR travelers, but is a flophouse for homeless people and a place of business for prostitutes**! . . . [W]hen we were on our way to check out, two women who we believe were prostitutes, got off the elevator before we got on. So not only is it not a hotel, it is a place of business for prostitutes! . . .

11. November 30, 2016, from TripAdvisor:

. . . Furthermore, my **"neighbor" was a ... working girl**. . . .

62.

Defendants knew or should have known of these and other customer reports showing the dangerous nuisance of the property and the rampant crime that occurred on the premises.

63.

Defendants and their employees knew or should have known that obvious sex trafficking, including Ms. Roseberry's sex trafficking, was occurring at their property, at times with the assistance of their employees.

64.

Despite the dangerous, illegal, and criminal activity surrounding the property, Defendants and the hotel negligently failed to implement appropriate security measures, policies, procedures, or training to identify, deter, or reduce such activity.

65.

Despite having actual or constructive knowledge of this illegal activity, Defendants negligently failed to take reasonable steps to stop such illegal and dangerous activities from occurring, including that involving its own employees.

66.

Additionally, Defendants negligently failed to provide proper training to their employees, including among other things, training them on the warning signs that prostitution or sex trafficking may be occurring at the hotel.

67.

Defendants also negligently failed to supervise their employees to ensure the hotel was not facilitating sex trafficking and participating in sex trafficking through the business of the hotel, as was the case with Ms. Roseberry's trafficking.

68.

Defendants also negligently failed to train their staff in a reasonable and uniform manner, including, among other things, how staff were supposed to interact with the police and attempt to determine the nature and cause of crime occurring at the property, so the hotel could better deter or prevent crime in the future.

69.

Defendants also negligently failed to develop a reasonable security plan to deter and prevent dangerous, violent, and illegal activity from continuing to occur at the property, including specifically prostitution, pimping, sex crimes, violence against women, and sex trafficking.

70.

Defendants knew or should have known that they were permitting the hotel to be used as a place of prostitution and sex trafficking.

**III. Defendants' knowledge of sex trafficking generally.**

71.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

72.

Defendants knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the Savannah Suites. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly $33,000.[5] Over the last two decades, sex trafficking has

---

[5] *See* Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable,* Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM/ (last visited Jan. 22, 2026); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30-32 (2014),

generated billions of dollars in illicit profits in metro Atlanta alone. Defendants received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Ms. Roseberry.

73.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking."[6]

74.

Defendants knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where . . . sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

---

https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Jan. 22, 2026).

[6] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* (Jan. 29, 2015), https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Jan. 22, 2026).

75.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and obtained information on involving motels and hotels were sex trafficking cases, and another 2.6 percent reported a combination of sex and labor trafficking.[7] A 2012 study found that 63 percent of trafficking incidents occurred in motels.[8] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[9] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[10]

---

[7] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://traffickinginstute.org/wp-content/uploads/2024/06/2023-2023-Federal-Human-Trafficking-Report-WEB-Spreads-LR.pdf (last visited Jan. 22, 2026).

[8] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.archive.org/web/20210511135432/https.www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf.

[9] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited Jan. 22, 2026).

[10] *Id.* at 23.

76.

Defendants knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in and around motels,[11] and that the industry had been warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[12]

77.

Defendants knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[13]

78.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

---

[11] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/getfile/92983.

[12] *Id.* at 19.

[13] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Jan. 22, 2026).

79.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

(a) persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b) persons who lack freedom of movement or are constantly monitored;

(c) persons who have no control over or possession of money or ID;

(d) persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e) extended stay with few or no personal possessions in the room;

(f) excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(g) the same person reserves multiple rooms;

(h) a room is rented hourly, less than a day, or for an atypical extended stay;

(i) loitering and solicitation of male patrons; and

(j) persons asking staff or patrons for food or money.

80.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Ms. Roseberry's case, the Savannah Suites, for a fee, provided this market for Ms. Roseberry to be confined and sold.

**COUNT I**
**STATUTORY LIABILITY: SEX TRAFFICKING**
**18 U.S.C. § 1595**

81.

Plaintiff incorporates the paragraphs above as if fully restated herein.

82.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

83.

Defendants knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Savannah Suites, including the revenue generated for the room in which Plaintiff was trafficked. Each day Plaintiff was trafficked at the Savannah Suites, Defendants knowingly benefitted by receiving money from Plaintiff's trafficking in the form of room-rental fees.

84.

Defendants participated in a hotel venture and knew or should have known that their operation of the Savannah Suites violated the TVPRA by harboring and falsely imprisoning Plaintiff so that she could be sold for sex at the hotel. Defendants also participated in a venture by actively cooperating with Plaintiff's traffickers, placing Plaintiff in locations intended to reduce detection, knowingly directing buyers of sex to her room, supplying buyers of sex with the items they requested, and permitting Plaintiff's sex traffickers to harbor, falsely imprison, and traffic Plaintiff at the Savannah Suites.

85.

As part of her sex trafficking, Plaintiff was falsely imprisoned at the Savannah Suites. Defendants' harboring Plaintiff during her sex trafficking constituted false imprisonment. At times, Plaintiff's false imprisonment at the hotel was independent of any other aspect of her trafficking, such as sexual encounters, assaults, or batteries she may have endured.

86.

The venture in which Defendants participated was in or affecting interstate commerce.

87.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives participated in Plaintiff's sex trafficking at the Savannah Suites. Defendants knew or should have known of this participation.

88.

Defendants also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the Savannah Suites.

89.

Defendants are directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

90.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this venture.

91.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

92.

Thus, as described herein, Defendants are jointly and severally liable to Plaintiff for damages arising from the indivisible injuries they caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

**COUNT II**
**NUISANCE**

93.

Plaintiff incorporates the paragraphs above as if fully restated herein.

94.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

95.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its

operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

96.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

**Public Nuisance**

97.

The Savannah Suites's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

98.

The Savannah Suites caused or contributed to a blighting effect on the surrounding community, so that the Savannah Suites negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the Savannah Suites, although the effects on each person may have varied.

99.

The illegal prostitution and sex trafficking nuisance occurring at the Savannah Suites had an appreciable blighting effect on the surrounding community, permitting

persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

100.

The acts and omissions of Defendants in permitting prostitution and sex trafficking at the Savannah Suites caused special damages to Plaintiff, as she was the victim of sex trafficking at Defendants' nuisance hotel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendants are liable to Plaintiff for all such damages.

**Public Nuisance Per Se**

101.

The Savannah Suites constituted a nuisance per se under Georgia law because Defendants knowingly and/or negligently turned a blind eye and permitted illegal sexually related crimes to occur at the Savannah Suites, including sex trafficking.

102.

A business where illegal practices are permitted constitutes a nuisance.

103.

A business, like the Savannah Suites, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

104.

Plaintiff was directly harmed as a result of the sex crime nuisance at the Savannah Suites that permitted illegal sexual activity to occur there.

105.

Defendants are liable for nuisance (public nuisance and/or per se public nuisance) by reason of their failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendants had express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

**DAMAGES**

106.

Plaintiff incorporates the paragraphs above as if fully restated herein.

107.

As a proximate and foreseeable result of Defendants' violations of the TVPRA and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and

punitive damages permissible under Georgia and federal law. Ms. Roseberry seeks all compensatory, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

(a) Physical injuries;

(b) Past, present and future conscious pain and suffering;

(c) Loss of enjoyment of life;

(d) Mental anguish and emotional distress;

(e) Incidental expenses;

(f) All compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

(g) Consequential damages to be proven at trial.

108.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

109.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable

attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

(a) Process issue as provided by law;

(b) Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants;

(c) Plaintiff be awarded all general, special, compensatory, economic, consequential, punitive and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendants;

(d) Plaintiff be awarded a trial by jury; and

(e) Plaintiff have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on October 7, 2026.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855

pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

# EXHIBIT 1

## Declaration of Robbie Harris

# DECLARATION OF ROBBIE HARRIS

Robbie Harris, pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury declares as follows:

1. My name is Robbie Harris. I am more than twenty-one years of age, competent to testify, and have no legal or mental disability. This declaration was executed in the state of Georgia, where I reside.

2. From about 2008 to 2012, I lived at Savannah Suites, 140 Pine Street NE, Atlanta, Georgia because I was unhoused at the time and had nowhere else to go. In 2013, I worked as a housekeeper at Savannah Suites. I would clean rooms on every floor.

3. I saw girls selling sex at the motel – they would walk around the motel, the parking lot, and when I was doing housekeeping I would see the girls in their rooms, some of whom were 14 or 15 years old. They'd ask me for extra towels, and I would often see their trash cans full of condoms, lubricants and other sex paraphernalia. When the girls selling sex were looking for men to purchase them ("johns"), they would often wear bathing suits, see-through, or other provocative clothing.

4. I would see johns going in and out of the girls' rooms. They would go into a room, stay for a short time, and then leave. This happened all day, every day.

5. There were pimps and drug dealers at the motel, too. The pimps would let you know who they were. They would act as though they were in charge, boss the girls selling sex around, and call them "shorty." I also saw pimps carrying guns. The pimps would pay off the security guards.

6. There was a lot of violence, such as pimps beating on the girls selling sex or the girls fighting each other over a john. I would often hear gunshots, and frequently heard people yelling and cursing in their rooms. People would also knock on doors throughout the night. I was told to report any incidents to my supervisor or to the security guard, but the security guards wouldn't call law enforcement.

7. The girls selling sex would walk right by security at the front of the property, sometimes alone and sometimes with a john. Security would let anyone onto the property.

8. The employees/owners rented rooms by the hour, and multiple rooms were allowed to be rented by one person.

9. When I worked there, I told the owners what was going on – girls were selling sex at the motel, some of these girls were very young, finding crack pipes - but nothing was ever done. The owners said they were "writing things down," but nothing was ever done. It was clear to me that the owners

cared more about making money than they did the girls selling sex at the motel and other illegal activity.

I have read this Declaration consisting of 9 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on 10 / 02 / 2026.

Robbie Harris

# EXHIBIT 2

## Declaration of Shirley Lawrence

**DECLARATION OF SHIRLEY LAWRENCE**

Shirley Lawrence, pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury declares as follows:

1. My name is Shirley Lawrence. I am more than twenty-one years of age, competent to testify, and have no legal or mental disability. This declaration was executed in the state of Maryland, where I reside.

2. For about two months in the summer of 2016, my wife and I stayed at Savannah Suites, 140 Pine Street NE, Atlanta, Georgia. We were newly married and were visiting the area. We stayed on the second floor towards the back of the motel.

3. We minded our own business, but I could tell there was a lot of illegal activity going on at this motel, including girls selling sex and people selling drugs. It was obvious from the way the girls would behave and the way they would dress, in revealing, tight clothing, high heels, etc., that they were selling sex. Sometimes I would see them standing on the corner, waiting for customers. The girls selling sex seemed young, 15 years old or younger. Another female guest that I think was selling sex at the motel told me that she paid a significantly lower rent rate than we paid, about $30 or $40 less.

4. There was a fence in the front but anyone could drive or walk in and then go directly to a room. There was no ID check. There were cameras on the

Initial

property, but I don't know if they worked. Often I would hear fights in some of the other rooms.

5. The employees/owners could see what I saw, but they didn't seem to care that girls were selling sex and other illegal activity was going on at the motel.

I have read this Declaration consisting of 5 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on 9/24/2026.

Signed by:
46989F00021E41A...
Shirley Lawrence

# EXHIBIT 3

## Declaration of Patricia Smith

**DECLARATION OF PATRICIA SMITH**

Patricia Smith, pursuant to 28 U.S.C. § 1746, and subject to the penalties of perjury declares as follows:

1. My name is Patricia Smith. I am more than twenty-one years of age, competent to testify, and have no legal or mental disability. This declaration was executed in the state of Alabama, where I reside.

2. In around the fall of 2016, me and my kids and my sister and her kids moved to Atlanta. We planned on staying at Savannah Suites, 140 Pine Street NE, Atlanta, Georgia until we found an apartment or a home. My children and I were in a room on the first floor and my sister and her children were in a room on the second floor. I'm not sure why but the management raised our rent and then after only a week they told us to leave. They wouldn't allow us to retrieve our personal items from our rooms, and Me, my sister and our respective children were on the streets for a couple of nights until we found another place to stay.

3. I saw girls selling sex at the motel, walking around the parking lot and along the street. They were visible to employees in the office and elsewhere. I could tell the girls were selling sex because of how they behaved and what they wore, which was very revealing clothing, some with very short bottoms that showed butt cheeks. Some of the girls I saw selling sex were as young as 13

Initial
PS

or 14 years old. I saw men who could have been pimps or drug dealers or johns hanging around, too. The motel had condoms available for purchase in the vending machines.

4. Traffic increased on the weekend. I saw guys pull into the parking lot, park and go into the motel, then come back out and leave a short time later. While there was a fence around the property, there wasn't a gate, just an opening, with no security present. I did not observe any employees or security guards monitoring who was coming and going on the property. I did not see any employees in the office at night. I saw people, maybe fellow guests, buying drugs from one of the male employees.

5. It seems like the management/owners cared more about making money than the safety of the guests. They allowed the illegal activity, including girls selling sex and people selling drugs, to continue.

I have read this Declaration consisting of 5 numbered paragraphs and I declare under penalty of perjury that it is true and correct.

Executed on 9/17/2026.

Signed by:
Patricia Smith
132B1B07772041A...
Patricia Smith